UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
NATALIA MAZZUCHELLI,                          :
                                              :
                          Plaintiff,          :   Civil Action No.: 7:23 Civ. 07885 (NSR)
                                              :
        v.                                    :
                                              :   **SECOND AMENDED COMPLAINT**
IMMUTABLE PTY. LTD and LIGHTSOURCE            :
GLOBAL,                                       :
                                              :   **Jury Trial Demanded**
                          Defendants.         :
                                              :
------------------------------------------------------------X

Plaintiff Natalia Mazzuchelli ("Plaintiff" or "Mazzuchelli"), by and through her undersigned counsel, Wigdor LLP, as and for her complaint against Defendants Immutable Pty. Ltd ("Immutable") and Lightsource Global ("Lightsource") (collectively "Defendants"), hereby alleges as follows:

**PRELIMINARY STATEMENT**

1.      On September 26, 2022, Mazzuchelli started working for Defendants Immutable and Lightsource as a Director of Partner Success. On September 29, 2022, only three days later, Mazzuchelli's direct boss, Shirley Anderson ("Anderson"), started to sexually harass Mazzuchelli. Anderson began to inundate Mazzuchelli with questions and stories about group sex, bisexuality, anal sex, extramarital affairs and Anderson's assessments about the sex lives of company executives. According to Anderson, one executive "needs to have more sex," another is in a "religious marriage" but "might be open to having sex and other relationships," and a third is "more calm" because he "gets to have more sex." On one occasion, Anderson insisted on coming to Mazzuchelli's hotel room during a work-related trip, where Anderson promptly stripped to her bra and underwear, and suggestively asked Mazzuchelli where she (Anderson)

1

should get a "boob job." Many of these encounters were sprinkled with Anderson's statements about wanting to have sex with more women and explore different experiences—an obvious effort to groom Mazzuchelli into a sexual encounter.

2. Mazzuchelli made clear that Anderson's harassment was unwelcome and opposed Anderson's discriminatory conduct by rebuffing Anderson's overture while also maintaining professional decorum because Mazzuchelli was afraid of retaliation.

3. On April 5, 2023, Mazzuchelli disclosed to Anderson that she was pregnant and that her pregnancy was high-risk. Anderson responded by—for the first time—criticizing Mazzuchelli's performance and questioning whether Mazzuchelli could "do this job pregnant" and whether Mazzuchelli was "motivated to be in this role."

4. On April 21, 2023, Mazzuchelli complained about Anderson's discriminatory conduct to Human Resources. Ten days later, Defendants fired her because of her "situation."

5. Defendants' conduct violated the anti-discrimination and anti-retaliation provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. ("Title VII"), the California Fair Employment & Housing Act, Cal. Gov. Code §§ 12940 *et seq*. ("FEHA") and the New York State Human Rights Law, N.Y. Executive Law §§ 290 *et seq*. ("NYSHRL").

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is a diversity of citizenship among the parties and this action involves an amount in controversy that exceeds $75,000, excluding interests and costs. This Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under Title VII.

7. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b) because Mazzuchelli lives and worked in this District.

**ADMINISTRATIVE PROCEDURES**

8. On September 23, 2023, Mazzuchelli filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII. The EEOC issued Plaintiff a Notice of Right to Sue on December 20, 2023.

9. On October 2, 2023, Mazzuchelli filed a Charge of Discrimination with the California Civil Rights Department ("CRD"). That same day, the CRD issued Plaintiff a Notice of Right to Sue.

10. Any and all other prerequisites to the filing of this suit have been met.

**PARTIES**

11. Mazzuchelli is an American citizen domiciled in Cold Spring, New York. At all relevant times, Mazzuchelli met the definition of an "employee" under applicable law.

12. Defendant Immutable is a technology company incorporated and headquartered in Australia. At all relevant times, Immutable met the definition of an "employer" under applicable law.

13. Defendant Lightsource is an employer services company incorporated in Delaware and headquartered in Florida. At all relevant times, Lightsource met the definition of an "employer" applicable law.

**FACTUAL ALLEGATIONS**

I. **BACKGROUND**

14. Mazzuchelli is an accomplished strategist and solutions leader with nearly two decades of experience.

15. In 2010, she graduated from Baruch College, earning a bachelor's in international marketing management with a minor in corporate communications.

16. She subsequently worked as a Client Solutions Manager at Meta where she managed a portfolio of top brand and agency partners. Because of her extraordinary work, Meta promoted Mazzuchelli numerous times. She ultimately rose to the position of Head of Global Vertical Solutions, eCommerce, responsible for leading multiple marketing programs with three million businesses globally.

17. After nine successful years at Meta, Mazzuchelli took an opportunity to build a world class NFT Partner Success organization at Coinbase as its Head of Global Partner Success, NFTs. Mazzuchelli developed and executed strategies across verticals, including art, entertainment, sports and more, as well as delivered team success metrics, such as increasing customer engagement.

18. In August 2022, Mazzuchelli came across the opportunity for a role at Immutable, a global tech company, as its Director of Partner Success. With her wealth of experience in business development and vertical solutions, Mazzuchelli was more than qualified for the position.

19. After a successful interview process, Mazzuchelli was offered the role as Immutable's Director of Partner Success and would be employed by both Immutable and Lightsource.

20. Pursuant to N.Y. Lab Law §§ 916 and 922, LightSource was a co-employer of Immutable's U.S. based employees and had responsibility for hiring, firing and disciplining such employees.

21. On September 8, 2023, Mazzuchelli accepted and executed Lightsource and Immutable's offer of employment ("Employment Agreement").

22. Mazzuchelli's Employment Agreement states, "[o]n behalf of Lightsource HR Global II LLC, we would like to extend this offer of employment." The Employment Agreement further identifies Immutable as the "End Client."

23. Under New York law, both the client, here, Immutable, and the PEO are employers. Therefore, Mazzuchelli was hired by both Lightsource and Immutable in her role as Director of Partner Success.

24. The Employment Agreement identifies Mazzuchelli's job title as Director of Partner Success and details her job description as set forth below:

- Lead and be accountable for managing the highest valued gaming partners.

- Grow our partners' businesses on Immutable X.

- Lead a team of Partner Success Managers and provide enablement for them to meet and exceed targets.

- Define and track against OKRs and deliverables for the Gaming pod.

- Identify trends and opportunities in the web3 gaming landscape.

- Represent Immutable at relevant local and international events.

- Effectively manage and mitigate risk across the Immutable X's gaming partners.

- Be a constant advocate for business partners of Immutable X.

- Be the voice of the partner to internal partners—translate their needs and advocate on their behalf.

- Enable the Gaming pod to negotiate sophisticated deals and manage the associated commercial and legal processes.

25. Pursuant to the Employment Agreement, Mazzuchelli was also required to notify both Immutable and Lightsource of any sick days, paid time off days or unpaid leaves of absence.

26. Mazzuchelli's Employment Agreement was executed by both Mazzuchelli and Shawn Stutz (Division President of Lightsource).

## II. MAZZUCHELLI'S SUPERVISOR SEXUALLY HARASSES HER

27. Almost immediately upon her arrival, Anderson, the Global Head of Partner Success and Mazzuchelli's boss, began to sexually harass Mazzuchelli.

28. Mazzuchelli started working September 26, 2022.

29. On September 29, 2022, Mazzuchelli met Anderson face-to-face for the first time in San Francisco, California, where the two had travelled for work.

30. Anderson suddenly launched into a graphic discussion about sex. Anderson told Mazzuchelli about her sexual desires, including that she enjoys being choked, bound and dislikes anal intercourse.

31. Anderson also disclosed that she likes to sleep with multiple people at the same time (she kept a "bucket list" of her sexual targets), goes to parties to meet people for sex, emphasized that she was in an open marriage and detailed her husband having sex with other women.

32. In an obvious effort to lure Mazzuchelli into a sexual encounter, Anderson expressed her desire to sleep with more women and "keep exploring sexually."

33. Anderson also detailed a sexual encounter with the founder of one of Immutable's main customers (the "Client") and asked for Mazzuchelli's advice about the affair.

34. Mazzuchelli found Anderson's conduct humiliating. She did not welcome the graphic sexual discussion with her boss, to whom she would have to report.

35. Moreover, Mazzuchelli joined Immutable to work, not to be roped into the sex-escapades of, or to have a sexual relationship with, her supervisor.

36. But it was her first week and she did not want to displease her direct manager—so Mazzuchelli tried to deflect the discussion by stating that the decision was up to Anderson, but that Anderson should consider her children. The night ended quickly thereafter.

37. The next day, September 30, 2022, Anderson asked Mazzuchelli if she could borrow some "going out clothes." Mazzuchelli agreed.

38. At the end of the evening, Anderson insisted on returning to Mazzuchelli's hotel room to return the clothes.

39. To avoid Anderson's sexual overtures, Mazzuchelli objected, repeatedly telling Anderson that she could return the clothes the following day, but Anderson refused.

40. And, once in Mazzuchelli's hotel room, Anderson took off the borrowed clothes in front of Mazzuchelli and sat on the hotel room bed in nothing but a bra and underwear, clearly expecting the two would have sex.

41. Once again, Mazzuchelli felt humiliated and degraded by Anderson's sexually charged conduct. She did not welcome, as a condition of her employment, Anderson's efforts to have a sexual relationship.

42. Fearing retaliation, and to avoid a conflict with her direct manager, Mazzuchelli excused herself to the bathroom, where she called her friend to come to her hotel room.

43. When Mazzuchelli returned from the bathroom, Anderson, still in only her bra and underwear once again began to discuss sex, including that she intended to move forward with an extramarital affair.

44. Anderson then proceeded to touch her own breasts and asked Mazzuchelli whether she (Anderson) should get a "boob job," which further humiliated Mazzuchelli.

45. Wishing to keep the peace and avoid any further degradation, Mazzuchelli stated that cosmetic surgery wasn't necessary but that it was Anderson's choice.

46. Much to Mazzuchelli's relief, at that moment her friend arrived.

47. Anderson suddenly got dressed, changed the topic of conversation and left shortly thereafter.

48. Mazzuchelli felt degraded by being forced to sit in a hotel room with her half-naked boss, with whom she had to work and to whom she had to report, and discuss sexually-charged topics. Mazzuchelli was forced to watch Anderson undress and put in the position to have to rebuff her supervisor's sexual advances and opine on whether Anderson should get a "boob job," until a friend could "save her" from the traumatic experience.

49. Only a few days later, on October 3, 2022, while on a business flight to Los Angeles, California, Anderson once again detailed her inappropriate relationship with the Client.

50. Anderson described the Client stroking her leg while they were in his car and expressing that they should be together.

51. Mazzuchelli, clearly uncomfortable, merely listened and responded as little as possible.

52. In mid-March 2023, while in Australia for work, Anderson disclosed to Mazzuchelli that another female co-worker visited Anderson's hotel room after a late night of karaoke, that they discussed their mutual desire to have sexual encounters outside of their respective marriages, but that Anderson was too tired "to proceed with anything sexual."

53. Thereafter, Anderson began to make inappropriate sexual comments about her colleagues, including that:

- Robbie Ferguson (Co-Founder and President), who is "asexual," is too "pent up" and so "jittery" and "can't stand still" because he "needs to have more sex."

- Alex Connolly (Co-Founder and Chief Technology Officer) is a "prude" and likely not "sexually happy" because he is in a "religious marriage," but he might be "open to having sex and other relationships."

- James Ferguson (Chief Executive Officer) is "more calm" and not as "pent up" because he is engaged and "gets to have more sex."

- Gillian Findlay (Chief Operating Officer) is one of her (Anderson's) "best friends," "parties a lot," is "very sexually active" and "shows up to work intoxicated."

54. Mazzuchelli was shocked and humiliated by being, once again, roped into Anderson's highly sexually explicit conversations and this time, at a work function. In no uncertain terms, Mazzuchelli wanted nothing to do with this graphic discussion.

55. As if elaborating on the sex-lives of company executives was not enough— Anderson turned her sexual focus on Mazzuchelli.

56. She began discussing her own bisexuality, desire to "date more women" and her disdain for anal sex. This, of course, was degrading and inappropriate. Mazzuchelli was at the conference in Australia to work and network for Immutable, but Anderson made it her mission to try to publicly goad Mazzuchelli into sexually charged conversations.

57. For the rest of the conference in Australia, Mazzuchelli tried to maintain distance between herself and Anderson and maintain professional conversation but was, nevertheless, walking on eggshells for the remainder of the trip in fear of what else Anderson would say or do.

58. Anderson's sexual harassment followed Mazzuchelli to New York. After all, Mazzuchelli still reported to, and had frequent conversations with, her supervisor, while working remotely.

59. While Mazzuchelli worked remotely from her home in New York, she spoke to Anderson—who made clear her sexual desire for Mazzuchelli—on numerous occasions, often several times a day *via* telephone and video calls.

60. Anderson's sexual harassment had an impact on Mazzuchelli when she worked for her corporate employers in New York. Each time that Mazzuchelli had a call with Anderson, Mazzuchelli would become anxious and uncomfortable at the thought that at any given moment Anderson could jump into another sexually-charged conversation about her own sex life or the sex lives of other Immutable employees—conversations that Mazzuchelli clearly wanted to part of but Anderson forced upon her nevertheless.

61. Moreover, Anderson continued to display her sexual interest in Mazzuchelli while Mazzuchelli worked remotely in New York. On multiple occasions, Anderson would video call Mazzuchelli while she (Anderson) was lying in bed and would emphasize to Mazzuchelli that she was "still in bed," clearly trying to goad Mazzuchelli into conversation of a sexual nature.

62. On one occasion, Anderson video called Mazzuchelli first-thing in the morning from her (Anderson's) bed wearing nothing but slinky silk pajamas. Mazzuchelli was, once again, humiliated to see her supervisor in such inappropriate dress while still in bed suggesting yet another sexually charged conversation.

10

63. Much to Mazzuchelli's relief, Anderson disclosed that she would be leaving Immutable in April 2023. Mazzuchelli was hopeful that, after April 2023, her humiliation and degradation by Anderson would finally cease.

64. In late-March 2023, Mazzuchelli was introduced to her new manager Radha Amalraj ("Amalraj"), who was in the process of being onboarded by Anderson.

### III. MAZZUCHELLI ANNOUNCES THAT SHE IS PREGNANT

65. On April 5, 2023, Mazzuchelli told Anderson, who was still her boss, that she was pregnant and that it was "high-risk pregnancy."

66. Anderson immediately questioned whether Mazzuchelli could "do this job pregnant?"

67. Mazzuchelli responded that she was more than capable of being in her current role while simultaneously pregnant.

68. Anderson was unconvinced because, in her view, Mazzuchelli had a "global intense" job.

69. Undeterred, Mazzuchelli reiterated that she could do her job while pregnant.

70. Anderson nevertheless questioned whether Mazzuchelli was "motivated to be in this role."

71. That same day, Anderson gave Mazzuchelli a false, negative performance review—the only negative feedback Mazzuchelli had received during her tenure.

72. Indeed, Mazzuchelli had received only positive feedback during her tenure, including, almost contemporaneously with Anderson's negative review, another manager praising Mazzuchelli's work on a critical project.

11

### IV. MAZZUCHELLI PROTESTS DISCRIMINATION

73. On April 21, 2023, Mazzuchelli complained that she was the victim of discrimination.

74. She told Robert Knight (Global Human Resources Business Partner) about Anderson's discriminatory comments regarding whether Mazzuchelli could perform her role while pregnant and her negative performance review.

75. Knight admitted that Anderson had behaved inappropriately before.

76. On April 26, 2023, Mazzuchelli's new boss, Amalraj, became concerned because executives had suddenly—and without basis—"raised concerns" about Mazzuchelli.

77. According to Amalraj, she no idea what the "concerns" could be, describing Mazzuchelli as a "high caliber talent" and who deserved "only positive feedback."

### V. DEFENDANTS UNLAWFULLY DISMISS MAZZUCHELLI

78. On May 1, 2023, less than a month after disclosing her pregnancy to Anderson, and only ten days after complaining about discrimination, Defendants fired Mazzuchelli.

79. Jason Suen (Immutable's Chief Commercial Officer) and Katherine Rau (Immutable's Chief People Officer) could not provide a substantive reason for the dismissal.

80. Rather, they stated that Mazzuchelli's employment was at-will and that her dismissal was the "best course of action."

81. Rau also repeatedly referred to Mazzuchelli's pregnancy as her "situation," and suggested that Defendants' offer of five months of COBRA as part of a severance package was generous in light of Mazzuchelli's "situation."

82. As a result, Lightsource and Immutable terminated Mazzuchelli's employment. Indeed, Lightsource provided Mazzuchelli an Employee Separation Form ("ESF"), which would

12

serve as the formal separation of employment from Lightsource and Immutable. The ESF identifies Mazzuchelli as the employee and Lightsource as the employer.

83. Moreover, Lightsource's internal documents made clear that Defendants did not terminate Mazzuchelli for any lawful purpose.

84. In fact, Mazzuchelli's ESF provided to her by Lightsource explains that she was not dismissed for "Unacceptable Performance", "Violation of Company Policy/Processes/Procedure" or "Excessive unexcused absences."

85. Indeed, the ESF conceded in writing that Mazzuchelli had not "received any written warning prior to termination." Moreover, Mazzuchelli's dismissal was not the result of any "Layoff" such as a "reorganization, closing, or lack of work."

## FIRST CAUSE OF ACTION
### (Discrimination in Violation of NYSHRL)
*Against All Defendants*

86. Plaintiff hereby repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

87. The NYSHRL makes it unlawful to discriminate against an employee because of her sex or familial status.

88. The NYSHRL also makes it unlawful to sexually harass an employee.

89. By the conduct described above, Defendants discriminated against Plaintiff.

90. As a result of Defendants' conduct, Plaintiff has suffered economic and non-economic injury for which she is entitled to monetary and other damages in an amount to be determined at trial, together with an award of punitive damages in an amount to be determined at trial, and any and all other available relief including attorneys' fees and costs.

## SECOND CAUSE OF ACTION
**(Retaliation in Violation of NYSHRL)**
*Against All Defendants*

91. Plaintiff hereby repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

92. The NYSHRL makes it unlawful to retaliate against an employee who has protested discrimination.

93. By the conduct described above, Defendants retaliated against Plaintiff.

94. As a result of Defendants' conduct, Plaintiff has suffered economic and non-economic injury for which she is entitled to monetary and other damages in an amount to be determined at trial, together with an award of punitive damages in an amount to be determined at trial, and any and all other available relief including attorneys' fees and costs.

## THIRD CAUSE OF ACTION
**(Discrimination in Violation of Title VII)**
*Against All Defendants*

95. Plaintiff hereby repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

96. Title VII makes it unlawful to discriminate against an employee because of her sex or familial status.

97. Title VII also makes it unlawful to sexually harass an employee.

98. By the conduct described above, Defendants discriminated against Plaintiff.

99. As a result of Defendants' conduct, Plaintiff has suffered economic and non-economic injury for which she is entitled to monetary and other damages in an amount to be determined at trial, together with an award of punitive damages in an amount to be determined at trial, and any and all other available relief including attorneys' fees and costs.

## FOURTH CAUSE OF ACTION
### (Retaliation in Violation of Title VII)
*Against All Defendants*

100. Plaintiff hereby repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

101. Title VII makes it unlawful to retaliate against an employee who has protested discrimination.

102. By the conduct described above, Defendants retaliated against Plaintiff.

103. As a result of Defendants' conduct, Plaintiff has suffered economic and non-economic injury for which she is entitled to monetary and other damages in an amount to be determined at trial, together with an award of punitive damages in an amount to be determined at trial, and any and all other available relief including attorneys' fees and costs.

## FIFTH CAUSE OF ACTION
### (Discrimination in Violation of FEHA)
*Against All Defendants*

104. Plaintiff hereby repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

105. FEHA makes it unlawful to discriminate against an employee because of her sex.

106. FEHA also makes it unlawful to sexually harass an employee.

107. By the conduct described above, Defendants discriminated against Plaintiff.

108. As a result of Defendants' conduct, Plaintiff has suffered economic and non-economic injury for which she is entitled to monetary and other damages in an amount to be determined at trial, together with an award of punitive damages in an amount to be determined at trial, and any and all other available relief including attorneys' fees and costs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A.　An injunction and order permanently restraining Defendants and their partners, officers, owners, agents, successors, employees, representatives or persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

B.　A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the applicable state and law;

C.　An award of damages in an amount to be determined at trial, plus pre-judgment interest, to compensate Plaintiff for all monetary and/or economic damages;

D.　An award of damages in an amount to be determined at trial, plus pre-judgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her mental anguish and emotional distress, emotional pain and suffering and any other physical and mental injuries;

E.　An award of damages to be determined at trial, plus pre-judgment interest, to compensate Plaintiff for harm to her professional and personal reputation and loss of career fulfillment;

F.　An award of punitive damages;

G.　An award of costs that Plaintiff has incurred in this action, as well as reasonable attorneys' fees to the fullest extent permitted by law; and

H.　Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: December 20, 2024
      New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _____
    Valdi Licul
    Kassandra Vazquez

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
vlicul@wigdorlaw.com
kvazquez@wigdorlaw.com

*Counsel for Plaintiff*